No. 6353.

Ex Parte Dick Duncan.

Habeas Corpus for Bail—Fact Case.—See the statement of the case for evidence *held* insufficient to support a judgment refusing bail,—murder being the offense charged against the relator.

Habeas Corpus on appeal from the District Court of Burnet. Tried below before the Hon. W. A. Blackburn.

The judgment of the lower court refusing bail to the relator is reversed, and bail is awarded him in the sum of six thousand dollars.

The first witness called to the stand was George B. Dunn. He testified that he lived in Eagle Pass, and was the justice of the peace in and for precinct number one of Maverick county. He held an inquest upon four dead human bodies found in the Rio Grande, and upon a complaint filed before him, he issued the warrant upon which the relator and Tap Duncan were arrested for the murder of the said parties. The first of said bodies was found on February 26, 1889; two others were found on February 28, 1889, and the fourth on March 2, 1889. They were all found on the American shore within six hundred yards of each other. Three were the bodies of females; two women

and a girl, and the other of a youth nineteen or twenty years of age. The skull of each was crushed in, evidently by blows from a blunt instrument. Large stones, weighing from thirty to fifty pounds, were attached to each of the bodies. The oldest of the four was a woman between forty-five and fifty years of age; the next a young woman twenty-eight or thirty years of age; the third in age was the boy, and the youngest was the body of a girl sixteen or seventeen years of age. Decomposition had so far advanced that it was impossible to tell anything about the features or complexion of the deceased parties. The hair of each was dark. From the pocket of the boy the witness took the pocket knife produced in court, marked M. F. & S. on both sides. After the bodies had been buried seven or eight days, that of the young woman—the second in age—was disintered, and from her mouth was taken the gold plate now in evidence, which had originally contained two teeth, one of which had been long missing. The bodies were barely moving with the current when discovered.

Joe S. Clark testified, for the State, that he lived in the town of San Saba, San Saba county, Texas, where he was engaged in selling wagons, agricultural implements, etc. On the twenty-second day of January, 1889, the witness sold to the relator a new "two and three-fourths inch Mitchell wagon, a set of wagon harness and a wagon sheet and bows." On the said wagon was printed the witness's business advertisement, as follows: "Sold by Joe S. Clark, San Saba." The relator did not take the wagon away on the day that he bought it, nor did the witness see him when he took it away.

Ed Hawkins testified, for the State, that he lived in San Saba county, Texas, and was acquainted with the Williamson family. The Williamsons lived within four hundred yards of the witness. The family consisted of "old" Mrs. Williamson, a widow lady, aged about fifty years; her widowed daughter, Lavonia Holmes, commonly called "Boney" Holmes, aged about thirty years; her son Ben Williamson, aged about twenty years, and her daughter Beulah Williamson, aged about sixteen years. A few days before the Williamson family left or disappeared from San Saba county, the relator told the witness that he had bought the Williamson place, and that he was going to let Mrs. Williamson have a new wagon and harness that he had recently bought, and two horses, in part payment for the place. The Williamson family disappeared from

their place in San Saba county about January 25, 1889. On the night they disappeared, witness heard a wagon pass his house and stop at the Williamson place. Soon afterwards a horse passed going in the same direction. Later in the night the wagon left the Williamson place. Witness had never seen any of the Williamsons since that night. Witness did not know who was driving the wagon that passed his house, nor who, if anybody, was riding the horse. On his cross examination he said that he did not know as a matter of fact that the relator traded for the Williamson place, nor what, if anything, he paid for it. Relator lived between three and four miles from the witness. He was in witness's neighborhood three or four days after the Williamsons disappeared.

Tom Hawkins testified, for the State, that he lived within four hundred yards of the Williamson family in San Saba county. One night late in January, 1889, a wagon, traveling from the "general" direction in which the relator lived, passed the witness's house, and stopped at the Williamson place. Soon afterwards a horse passed, going in the same direction. The wagon remained at the Williamson place about two hours, during which time the witness heard a noise which sounded like the loading of a wagon. The Williamson family were gone on the next morning. During the forenoon of the said morning the relator, with Jim McDonnell and Hugh Harkley, in a wagon containing a bedstead and sofa, passed witness's shop, traveling from the Williamson place. Relator asked witness: "What have you done with your neighbors?" Witness replied: "They have gone, but I suppose will come back again;" to which the relator replied: "I'll be damned if they ever come back."

Frank Ward testified, for the State, that he lived in San Saba county, and knew the Williamson family, the individuals of which he described as did the witness Hawkins. Mrs. Boney Holmes wore a gold plate in her mouth which originally held two false front teeth. It contained but one at the time of her disappearance. The witness had often seen that gold plate, and had held it in his hands. The gold plate exhibited to witness was the same plate, or its exact counterpart, that Boney Holmes wore in her mouth.

John R. Hughes testified, for the State, that he was a State ranger. On the sixth day of February, 1889, the relator came to Camp Woods, in Edwards county, where the rangers were,

ate dinner with them, and remained about four hours. He said that he had come from San Angelo, and was going to Eagle Pass; that he was traveling with a family named Jones who were going to or near Brackett. On the same day, but after the relator left, a man who said his name was Jones came to the camp hunting horses. On the following morning, at a point about three quarters of a mile from the camp, the witness and his party met the relator and the man Jones, one riding a bay and the other a sorrel horse. They were about three hundred yards in advance of a two-horse wagon, which the relator said was his "outfit." When the wagon came up, witness saw that it was a new vehicle, and showed by words printed on it that it came from San Saba. It was driven by a young man eighteen or twenty years old, and contained three females who corresponded with the Williamson women as described by the witness Hawkins. The party was traveling south, and the relator said that he was going after horses. The man called Jones was not Tap Duncan, the brother of the relator. On or about March 1, 1889, the witness saw the relator, and old man Duncan and Tap Duncan on the east prong of the Nueces river in Edwards county. They were going north towards Junction City, in Kimble county. The point on the east prong of the Nueces river, where witness saw the Duncans, was about one hundred and fifty miles from Eagle Pass, in Maverick county. The said parties then had Winchesters and pistols, and were arrested for carrying the latter. Sergeant Aten told the relator that whatever statement he might make in regard to a matter he intended to inquire about could be used in evidence against him, and then asked him who the parties were that he moved down the country some time before. Relator replied: "One was Cravey's wife, my sister; the other was my sister, the wife of Thompson. Thompson is the man who drove the wagon. He is on the dodge about a little cow case; you don't blame me for that, do you?" On the following morning relator said that the old woman of the party he took down was his mother, and that the correct name of the man Jones who went down with him was H. W. Landers. Sergeant C. G. Aten testified, for the State, substantially as did the witness Hughes.

Tom Selman testified, for the State, that between February 9 and 12, 1889, he saw three men and three women in camp, about nine miles east of Brackett, in Kinney county, Texas They had a new wagon, which the witness did not particularly

notice. The women, in age, suited the description of the Williamson women as given by preceding witnesses. Witness talked with one of the men, who looked to be twenty-eight or thirty years old. In the course of that conversation, that man said his name was Williamson. Witness had never seen that man nor the women since. About February 19, the witness saw the other two men in Brackett. To the best of his belief the relator was one of those two men.

James Nolan testified, for the State, that he was the sheriff of Kinney county. He saw the relator and another young man in Brackett, Kinney county, on the tenth day of February, 1889, and saw relator again on the next morning, when he was introduced to the relator as Dick Duncan. Witness remarked to him: "I saw you yesterday with another young man." He replied: "Yes—with Landers." On the said tenth day of February relator was riding a bay and Landers a sorrel horse. Witness remarked to relator: "I knew your father when he lived in Kinney county." Relator replied: "He now lives below Eagle Pass, and I am now on my way to visit him. I have a wagon camped out of town."

George Hobbs testified, for the State, that he kept a store in Spofford, Kinney county, Texas. On February 11, 1889, the relator and another man came to his store and inquired the way to Eagle Pass. About the twentieth day of the same month the relator came to witness's store, and left his horse and Winchester rifle and went to Eagle Pass on the train, returning three or four days later with his father and his brother Tap. When he left, the relator said that he was going back to Eagle Pass to sell his horse. When he brought his gun to witness's store on February 20, witness noticed that it was bent about the magazine. Relator said that he bent it by striking a jack over the head with it.

W. W. Collins testified, for the State, that on February 9 or 10, 1889, he saw a two horse wagon, containing a young man and three women, near Spofford, going towards Eagle Pass. A sorrel horse was tied behind the wagon. On the next day the relator rode into Spofford on a bay horse from the direction of Brackett. He had his Winchester gun with him. Witness got a good view of the gun and was positive that it was in perfect repair then. Three or four days later the relator returned to Spofford from the direction of Eagle Pass, riding the sorrel horse that passed through Spofford when tied behind the

wagon. His Winchester gun was then badly bent about the magazine. Eagle Pass was about thirty-five miles distant from Spofford. J. C. Yates testified, for the State, as did Collins, except that he said nothing about the Winchester gun.

Fred Berndt testified, for the State, that he lived in Piedras Negras, in Mexico, opposite the town of Eagle Pass, in Texas. The relator came alone to the witness's ranch on the twelfth or thirteenth day of February, 1889. His brother, Tap Duncan, was then at the witness's ranch, and had been for ten or twelve days. Relator told witness that he had come from San Saba to Eagle Pass to visit his sister, Mrs. Cravey, who had been in Eagle Pass since February 1. He also said that he left his two partners near Brackett. He said that one of his partners was named Landers. The witness had forgotten the name of his other partner as given by relator. He remained one day and left, returned on the sixteenth, remained over night, and left. He came back on the twenty-first and took his sister's things from the ranch to Eagle Pass. Witness was with Tap Duncan every day from February 1 to February 22.

W. J. Brown testified, for the State, that he lived in Kinney county on the West Nueces. On or about February 23, 1889, the relator came to the witness's house inquiring for a man and wagon camped in the vicinity. He passed the night with witness; his actions aroused the witness's suspicions. He appeared restless and uneasy. He said that he came from San Angelo and was going to Junction City. Witness told him he was on the wrong road, and he then said he was going to McKavett, and witness told him he was on the right road. He then said that he had been to Mexico after stolen horses; that he was followed, arrested, jailed, fined forty-five dollars, and deprived of his pistol; and that on the advice of the American consul he crossed the river. He then said that he wanted to go to Camp San Saba. Several days afterwards, old man Duncan and Tap Duncan, the father and brother of the relator, traveling in an old wagon, came to witness's house.

Tom Perry testified, for the State, that he was at W. J. Brown's house on February 23, 1889, when the relator came there as testified by Brown. His narrative corresponded with Brown's except that relator told him that he had spent the winter on Devil's river, hunting.

Albert Schwander testified, for the State, that he lived a few miles distant from the witness Brown. On or about February 18,

1889, a man with a new wagon camped near the witness's place. On or about February 24, 1889, that man was joined by the appellant. They told witness that they were waiting for another wagon and two men, and they put four horses in the witness's pasture. Relator soon afterwards went off down the river, and in a day or two returned ahead of two other parties traveling in an old wagon. The man who camped near witness's place with the relator claimed his name to be Landers.

Louis Charles testified, for the State, that he lived near the witness Schwander's house in Kinney county. One day late in February, 1889, a man came to the witness's house and offered to sell witness a mattress. The witness went with him to the house of a Mexican to see the mattress, and when he got there he found the relator. Thence witness, relator and the other man went to a camp near Schwander's field, where the mattress was shown to witness. Witness did not buy it; but bought a quilt from the relator. There were six or seven quilts in the wagon, all somewhat worn but clean.

A. W. Haley testified, for the State, that he lived near Barksdale, in Edwards county. The relator came to witness's place on February 27, 1889, and asked the way to Junction City, and if there was a way to that town that did not lead through Barksdale. He then asked witness to tell his father and brother, who would soon pass in a wagon, to go through Barksdale, which the witness did. Relator's gun was then bent at the magazine. He said he had struck a jack over the head with it.

Sam Thurman testified that on March 10 or 11, 1889, he met a party of three men and a boy near Fredonia, in Mason county, going toward San Saba. He took the relator to be one of those parties. He had a Winchester that was bent about the magazine. There were two wagons in the party. Witness took no special notice of the wagons.

W. N. Cook, sheriff of Maverick county, testified that he saw the relator in Mexico, across the Rio Grande from Eagle Pass, on February 20 or 21, 1889, and on the next day saw him in Eagle Pass. He saw the bodies found in the river, which he described substantially as did the preceding witnesses.

The State closed.

Hugh Harkley testified, for the relator, that he was with the relator and Jim McDonnell on the morning after the Williamson family left San Saba county, and heard the conversation

between the relator and the State's witness Hawkins. Hawkins remarked that the Williamsons would be back within a month. The relator replied that he did not think they would come back, as he had bought their place and they had no place in the neighborhood to occupy. Relator did not say "I'll be damned if they ever come back."

On cross examination, this witness denied that he ever told S. B. Howard that relator, in reply to Hawkins, said: "I'll be damned if they ever come back;" or that he told said Howard that, when taking down the bed in the Williamson house on the morning after the family left, the relator remarked that he had several times had sexual intercourse with the little girl on that bed.

S. B. Howard, when called by the State in rebuttal, contradicted the witness Harkley in his denial of the two statements imputed to him.

No brief on file for the relator.

*W. L. Davidson*, Assistant Attorney General, for the State.

Willson, Judge. As presented to us in the record, the proof is not evident that the applicant committed the horrible murders with which he stands charged. We, therefore, reverse the judgment denying him bail, and grant him bail in the sum of six thousand dollars, upon giving which, in accordance with the law in such case provided, he will be released from custody.

*Ordered accordingly.*